UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at WINCHESTER

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 4:06-cr-34 |
| v. ) | |
| ) | Judge Mattice |
| CHARLES STEVEN METCALF ) | |

**MEMORANDUM AND ORDER**

Before the Court is Defendant Charles Steven Metcalf's Motion to Suppress Evidence [Court Doc. No. 12]. In that Motion, Defendant Metcalf seeks to suppress all evidence seized and statements given in connection with a warrantless search of his residence in Lincoln County, Tennessee, on or about September 9, 2006. As grounds for such Motion, Defendant Metcalf contends that the subject search of his residence was conducted by police without his consent. After considering the evidence offered at the evidentiary hearing and the arguments of counsel, and for the reasons set forth herein, the Court has determined that said Motion will be **GRANTED**.

**I.    RELEVANT FACTS**

An evidentiary hearing was held before the undersigned on Friday, May 18, 2007. Defendant was represented by Assistant Federal Defender Mary Ellen Coleman. Assistant United States Attorney James Brooks represented the Government. Testifying for the Government was Investigator Rodney Callahan of the Lincoln County, Tennessee, Sheriff's Department. Testifying for the Defendant was Mr. Edward Todd Noblitt. A summary of the relevant testimony follows.

*Rodney Callahan*

Rodney Callahan has been employed as an Investigator for the Lincoln County, Tennessee, Sheriff's Department for approximately ten years. Prior to such employment, he worked for four years for the United States Bureau of Immigration and Custom Enforcement (or its predecessor agency) in Atlanta, Georgia.

On September 9, 2006, Officer Callahan received a telephone call from a game warden for the Tennessee Wildlife Resource Agency ("TWRA"). The TWRA agent told Officer Callahan that he had spotted a red pick-up truck leaving a field near Howell, Tennessee—where the TWRA was holding a juvenile dove hunt—and had observed marijuana plants nearby. The TWRA agent had recorded the license tag number of the truck and passed it along to Officer Callahan, who ran it through the state's vehicle registration database. Those records reflected that the truck was registered to the Defendant, and indicated Defendant's address as being on Booneville Road in Lincoln County. Officer Callahan was familiar with the vicinity, and decided to go to Defendant's residence.

Officer Callahan described the area where Defendant's residence is located as being "out in the woods." Upon arriving at the residence, Officer Callahan observed two individuals (who were later identified as the Defendant and Edward Todd Noblitt) inside the residence, running through the house. Officer Callahan made this observation by peering through windows without curtains which were located on each side of the front door. Officer Callahan knocked on the front door and Mr. Noblitt appeared.[1] Officer Callahan

---

[1] Officer Callahan testified that on the day in question, he was dressed in civilian clothes rather than a uniform. He was, however, wearing a badge. He carried an unconcealed weapon, but never drew it.

asked if Mr. Metcalf was at home, and Mr. Noblitt responded that he was inside. Officer Callahan asked if he could speak to him. The Defendant came to the door and, at Officer Callahan's request, came outside the residence. Officer Callahan told the Defendant that he needed to speak with him about an incident that had occurred earlier in the day.

When Officer Callahan asked the Defendant why he and Mr. Noblitt had been running around inside the residence, the Defendant replied that they had been smoking a "joint." Based on his experience, Officer Callahan knew that this meant that the Defendant had been in possession of marijuana, which was against the law. When Officer Callahan asked the Defendant if he had any more marijuana, he stated that he had a joint in his pocket. When Officer Callahan asked to see it, however, the Defendant was unable to produce it. Instead, the Defendant stated that he must have left the joint inside the residence on the kitchen table. At this point, Officer Callahan asked the Defendant if he minded if Officer Callahan accompanied the Defendant inside the residence to get the marijuana off the table. Officer Callahan testified that Defendant responded that he did not mind. Officer Callahan and the Defendant then went inside the residence, while Mr. Noblitt remained standing outside.

Once he went inside the residence, Officer Callahan observed the marijuana on a table in plain view. He then asked the Defendant if there was any more marijuana in the residence, and Defendant responded that he had some in a bedroom chest drawer. Officer Callahan asked the Defendant if he would go retrieve the marijuana from the bedroom, and he did. As Officer Callahan took the marijuana from the Defendant, the Defendant ran over to the kitchen sink and began to pour out a white substance which had been sitting nearby in a glass container. When Officer Callahan asked the Defendant what

he was pouring into the sink, after an initial hesitation the Defendant stated that he had been "cooking speed for a fishing trip." Officer Callahan knew, based on prior experience, that "speed" is a slang term for methamphetamine. Officer Callahan testified that his prior law enforcement experience included investigating cases involving methamphetamine, that he had previously been in houses that contained methamphetamine labs, and that he had received law enforcement training regarding methamphetamine. He was aware of the dangers associated with the manufacture of methamphetamine.

Officer Callahan testified that, after receiving this information, he observed other precursor products associated with the manufacture of methamphetamine in the residence, including Heet, coffee filters, and a hot plate. Officer Callahan then told the Defendant that they needed to go outside and talk, and the Defendant followed Officer Callahan outside. Once outside, Officer Callahan told the Defendant that, because the residence had been used to manufacture methamphetamine, it would be necessary to evacuate the residence. Officer Callahan also informed the Defendant that he intended to contact other law enforcement agencies for assistance in processing the methamphetamine lab. Once he had finished this explanation, Officer Callahan advised the Defendant of his *Miranda* rights,[2] and asked the Defendant to sign a consent to search form so that he and other law enforcement officers could re-enter the residence. Officer Callahan testified that the Defendant responded by stating that he and Mr. Noblitt were about to go on a fishing trip and that they were cooking the methamphetamine for personal use on the trip. According

---

[2] Officer Callahan testified that when he advised Defendant of his *Miranda* rights, he read from a card which he carried for that purpose and which he had with him on the day in question. Although Officer Callahan did not have his *Miranda* rights card with him on the day of the evidentiary hearing, the Assistant United States Attorney borrowed one from another agent and Officer Callahan stated that the card was identical to the one he used on September 9, 2006.

to Officer Callahan, the Defendant nevertheless signed the consent to search form, which was introduced into evidence as Government's Exhibit No. 1.

On cross-examination, Officer Callahan testified that on the date in question, he and Marty Mathis, also of the Lincoln County Sheriff's Department, arrived at the Defendant's residence in the early evening at approximately 6:00 p.m. He stated that, after knocking on the door, the individuals inside continued running around and that approximately ten minutes elapsed before Mr. Noblitt opened the door. Officer Callahan testified that because the front door was somewhat above ground level, and because he did not walk up the makeshift concrete steps, it was necessary for him to knock on the bottom of the door. Officer Callahan stated that Officer Mathis was standing with him as he had his initial conversation with the Defendant and never left the scene during the course of the relevant events.

Officer Callahan also testified that after observing the meth lab inside the residence and going outside, due to the lack of cell phone coverage in the rural area, he was unsuccessful at contacting further law enforcement for back-up until approximately thirty minutes later. Officer Callahan stated that the Defendant and Mr. Noblitt remained with him and Officer Mathis outside the residence during the entire period as they waited for the back-up law enforcement officers to arrive.

On cross-examination, Officer Callahan testified that it was only after the back-up officers arrived that he *Mirandized*[3] the Defendant and that it was at that point that the

---

[3] The Court notes that, during his direct examination, Officer Callahan did not mention that back-up law enforcement officers had arrived by the time he read the Defendant his *Miranda* rights and that the sequence of events described by Officer Callahan in his direct testimony seems to be inconsistent with that described on cross-examination.

Defendant was placed into custody in a police car. Officer Callahan testified that he and the other law enforcement officers did not re-enter the residence until after the Defendant had signed the consent to search form. Officer Callahan could not recall whether he had asked the Defendant if the officers could also conduct a search of any outbuildings on the premises. Defense counsel pointed out on cross-examination that the consent to search form reflected the date, but did not have a time endorsed on it. Officer Callahan confirmed that he never attempted to obtain a search warrant in connection with the encounter at issue; instead, he relied on the consent to search form.

While there were no attempts to field test the alleged methamphetamine found during the search, it was later sent to a lab which produced a toxicology report. The toxicology lab report was introduced as Defendant's Exhibit No. 1.

Also on cross-examination, Officer Callahan testified that upon receiving the initial call from the TWRA agent who alerted him to Defendant's pick-up truck, the agent stated that he knew the Defendant. The TWRA agent did not at that time, however, mention to Officer Callahan at that time that the Defendant had a son of the same name.

<u>Edward Todd Noblitt</u>

Mr. Noblitt has known the Defendant for at least 20 years. He calls the Defendant "Steve" and became "fishing buddies" with him within the past two years. On September 9, 2006, Mr. Noblitt arrived at the Defendant's residence at approximately 5:20 p.m. with the intention of going fishing with the Defendant. He had previously met the Defendant at the same residence at least 20 or 30 times for the same purpose. Mr. Noblitt describes the Defendant's residence as "rustic, a rough log cabin, still in the works of being constructed." He stated that the Defendant's former house had burned several years ago and, since that

time, the Defendant has been in the process of slowly rebuilding his residence with his own hands.

On the afternoon in question, the Defendant and Mr. Noblitt had been down to a nearby creek to catch minnows for bait. They had returned to the Defendant's residence, and the Defendant was doing laundry before they left for the fishing trip. Mr. Noblitt was putting his shoes back on when there was a knock at the door and, at the Defendant's request, Mr. Noblitt answered it. The visitor asked for Mr. Metcalf, a request that Mr. Noblitt transmitted to the Defendant, who asked that Mr. Noblitt inform the visitor that he would be right there.

Mr. Noblitt was shown a series of five photographs of the Defendant's residence, which he identified and which were ultimately admitted into evidence as Defendant's collective Exhibit Nos. 2-6. From the photographs, Mr. Noblitt was able to describe the Defendant's front porch on the date in question, which consisted only of a frame, without flooring. It was therefore necessary to have a steep set of make-shift concrete block steps leading from ground level to the raised level of the front door. Mr. Noblitt thus confirmed Officer Callahan's testimony that when Officer Callahan initially knocked on the Defendant's front door, he was standing on gravel, well below the base of the door. To provide perspective, Mr. Noblitt testified that he is 5'9" tall and, when standing in the same position on the gravel as was Officer Callahan on the day in question, he cannot see inside the front windows on each side of the front door through which Officer Callahan testified that he could see people running inside the residence. Mr. Noblitt stated that the individuals who came to the front door and asked for the Defendant did not immediately identify themselves as police officers and were not wearing uniforms. While they were

waiting for the Defendant to emerge from the residence, Mr. Noblitt walked to his pick-up truck to ensure that he had everything he needed for the fishing trip. He testified that the visitors followed him to the truck as they waited for the Defendant.

Mr. Noblitt stated that, once the Defendant joined them outside, Officer Callahan told the Defendant that it would be in the Defendant's best interest if he followed the officers to the Lincoln County Sheriff's Department. When the Defendant asked why that would be the case, one of the officers informed the Defendant that they suspected him of growing marijuana. According to Mr. Noblitt, the Defendant responded by shrugging, getting into his truck and actually moving it several feet. This surprised Mr. Noblitt, and he concluded that he did not want to be associated with this encounter; accordingly, he decided to leave the scene in his own truck and come back later.

According to Mr. Noblitt, the officers then prepared to follow the Defendant, but when they observed that Mr. Noblitt did not seem to be leaving, Officer Callahan got out of his vehicle to inquire of Mr. Noblitt what he was going to do. It was at this point that the Defendant stopped the engine of his truck and came back to Mr. Noblitt's truck to inquire what was going on. At that point, Officer Callahan asked the Defendant and Mr. Noblitt why they seemed to be so nervous. According to Mr. Noblitt, they responded by saying that they weren't nervous; they were just anxious to go fishing.

At that point, Officer Callahan asked the Defendant whether he had been growing marijuana and whether he had any marijuana on his person, and he requested that the Defendant empty his pockets. According to Mr. Noblitt, the Defendant complied and showed that he had nothing in his pockets. Officer Callahan then asked the Defendant if he was sure he did not have any marijuana on the premises, because it was time to be

honest and that the officers could come back and find out if he was lying. Officer Callahan said that if any marijuana was in the residence, the Defendant should go inside and bring it out. In response to this, the Defendant went back inside his residence and returned with some kind of green box and showed the officers that it was empty.

Officer Callahan then instructed the Defendant to return to his residence and search again for marijuana. While the Defendant was still inside on this occasion, Officer Callahan, who had been trying to get a signal on his cell phone, went inside the residence, joining the Defendant. Mr. Noblitt testified that he never heard the Defendant invite Officer Callahan inside the residence; rather, Mr. Noblitt observed that Officer Callahan apparently went inside spontaneously. According to Mr. Noblitt, in order to enter the residence, it was necessary for Officer Callahan to walk up the make-shift concrete block steps, turn the door knob of the closed door, and enter the house. As Officer Callahan entered the residence, Mr. Noblitt and Officer Mathis were still standing outside, at the back of Mr. Noblitt's pick-up truck. At that time, a small dog which was on the premises seized an article of Mr. Noblitt's clothing and Mr. Noblitt chased the dog to the other side of the house.

Shortly thereafter, Officer Callahan exited the residence at a rapid pace and stated to Officer Mathis that he thought that there was a meth lab inside. The Defendant followed Officer Callahan outside, at which point Officer Callahan, who was by then apparently attempting to radio for law enforcement back-up from his vehicle, asked the Defendant what they had been "cooking" inside the residence. While the Defendant did not reply, Mr. Noblitt told Officer Callahan that they had not been cooking anything; instead, they had been preparing to go on a fishing trip. At that point, the officers took the Defendant and

Mr. Noblitt to their police vehicle, handcuffed them, and, a few moments later when additional law enforcement officers arrived, placed the Defendant and Mr. Noblitt into the back seat of one of the newly-arrived patrol cars.

As Mr. Noblitt and the Defendant sat in the back seat of one of the patrol cars, their backs were to the residence but, by looking backwards over their shoulder, they could see the residence. From this vantage point, Mr. Noblitt observed some of the officers return inside the residence. It was not until several hours later, close to 11:00 p.m. or midnight, when an officer returned to the patrol car, stated to the Defendant that they had entered the house and seized certain items and would like to search an outbuilding on the premises which was chained and locked. Because the Defendant had possessions in the outbuilding which he did not want damaged, he provided the officers with the key to the outbuilding. According to Mr. Noblitt, it was only at that point that the officers presented the Defendant with a consent to search form, which Mr. Noblitt read to the Defendant and which the Defendant signed.

On cross-examination, Mr. Noblitt described the interior of the Defendant's residence as being framed but only partially walled. Accordingly, a visitor can see throughout most of the house upon entering. Mr. Noblitt confirmed that he had been inside the residence the night before, cooking some beans and fish for dinner. While confirming that he knew that the Defendant had a hot plate in the residence for cooking, Mr. Noblitt denied any recollection of having observed any bi-layered liquids in jars. Mr. Noblitt also testified that he did not notice any precursor elements of methamphetamine or firearms at the residence. In fact, Mr. Noblitt testified that he had never seen firearms at the

Defendant's residence. He stated the Defendant routinely used a bow and arrow for hunting.

Still on cross-examination, the Assistant United States Attorney showed Mr. Noblitt a signed statement that he gave to Bureau of Alcohol, Tobacco, Firearms and Explosives Agent Stephen Gordy shortly after the incident in question. According to the Government, the statement reflected that Mr. Noblitt had observed the Defendant shooting a .22 caliber rifle. Mr. Noblitt testified, however, that he had been referring to the Defendant's son, whose name, he thought, was Josh Metcalf. Mr. Noblitt conceded that there other were points in the statement at which he had, in fact, been referring to the Defendant as "Metcalf." Mr. Noblitt explained that these apparently inconsistent references were made at different points in what had been a very lengthy and sometimes confusing conversation with Agent Gordy. Mr. Noblitt confirmed that his reference in the statement to having observed "Metcalf" smoking marijuana was, in fact, a reference to the Defendant.

Mr. Noblitt stated that, while he and the Defendant had spoken very briefly about the events of September 9, 2006, while they had been incarcerated together shortly after the incident, they had spoken only a couple of times since, when the Defendant had called Mr. Noblitt from jail. Mr. Noblitt confirmed that he had been warned that those telephone calls were recorded. When shown the photographs of the interior of the Defendant's residence which had been introduced into evidence as Defendant's Exhibit Nos. 2-6, Mr. Noblitt recalled having seen some of the items pictured, but did not recall others.

On re-direct examination, Mr. Noblitt testified that it had been Agent Gordy, and not he, who had transcribed the statement about which he had been questioned on cross-examination. Mr. Noblitt confirmed that he and Agent Gordy, in the course of a ten-minute

conversation, had covered a variety of different topics. He gave the statement during the five days that he spent in jail following the incident in question.

## II. ANALYSIS

The Fourth Amendment to the United States Constitution provides as follows:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

"[T]he 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " *Payton v. New York*, 445 U.S. 573, 585 (1980) (quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972)). 'It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586 (internal quotation marks omitted).

This basic principle is not, however, without exceptions. A search conducted pursuant to a valid consent[4] is a well-recognized exception to the Fourth Amendment's general warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). If the validity of the alleged consent is challenged, the Government has the burden to show by a preponderance of the evidence that, based on the "totality of the circumstances," the consent was knowingly and voluntary. *See, e.g.*, *United States v. Mendenhall*, 446 U.S. 544, 557 (1980); *United States v. Abdullah*, 162 F.3d 897, 902 (6th Cir. 1998).

---

[4] The Government does not argue, and the Court cannot discern any basis for the assertion of, the application of any of the other exceptions to the general warrant requirement such as exigent circumstances, etc.

In the case at bar, the Defendant's success or failure on the instant motion depends entirely on whether the Government has carried its burden of establishing that the Defendant gave his consent prior to law enforcement's initial entry into his residence. *See, e.g.*, *United States v. Buchanan*, 904 F.2d 349, 355-56 (6th Cir. 1990) (consent to search invalid when given subsequent to unlawful entry into defendant's home). If the Government has not carried its burden, then all evidence seized as a result of that unlawful entry must be excluded unless the taint of the initial illegality has somehow been purged or has become so attenuated from the seizure of the evidence that the taint has been dissipated. *Id.*; *see also Wong Sun v. United States*, 371 U.S. 471, 486 (1963).

In this regard, the pertinent testimony of the only two witnesses is directly contradictory. Officer Callahan insists that the Defendant assented to his entry into the residence when Officer Callahan asked if the Defendant would mind if Officer Callahan went inside to look for an alleged marijuana joint on the kitchen table.[5] Both Officer Callahan and Mr. Noblitt agree that Mr. Noblitt was standing outside the residence with Callahan and the Defendant when this exchange allegedly took place.[6] Mr. Noblitt, however, denies that this critical exchange took place. Instead, as Mr. Noblitt describes it, Officer Callahan seemingly wandered into the residence at a later point, through a

---

[5] The Court notes, however, that Officer Callahan's description of the Defendant's behavior during this critical exchange might be characterized as mere acquiescence to apparently lawful authority. If this characterization is accurate, then even Officer Callahan's version of such events would not suffice to establish the Defendant's consent. *See, e.g.*, *Bumpers v North Carolina*, 391 U.S. 543, 546-47 (1968) (no consent to search if only acquiescence to apparently lawful authority); *United States v. Jones*, 641 F.2d 425, 429 (6th Cir. 1981) (consent not valid when given in "submission to authority rather than as an understanding and intentional waiver" (internal quotation marks and citation omitted)).

[6] Officer Mathis was also apparently present during the critical exchange, but he did not testify.

closed but unlocked door, while the Defendant was inside, without ever first having received permission to enter from the Defendant or Mr. Noblitt.

Officer Callahan and Mr. Noblitt testified to what the Court views as equally plausible versions of how the pertinent events may have unfolded on the day in question. Despite the vigorous cross-examination of each witness by opposing counsel, the Court could discern nothing which in any way materially disproved either alternative version of events. Under these circumstances, and in the absence of any substantially corroborative or impeaching evidence on either side, the Court must conclude that the evidence is equally balanced.

Accordingly, the Court finds that the Government has failed to carry its burden of proof of establishing, by a preponderance of the evidence, the Defendant's consent to the warrantless search of his residence. *See, e.g.*, *Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997) (citing *Director, Office of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267, 281 (1994) ("[W]hen the evidence is evenly balanced, the [party with the burden of persuasion] must lose.")).

## III.   CONCLUSION

For the reasons stated above, the Court finds that based on the totality of the circumstances the Government has failed to establish by a preponderance of the evidence that Defendant Metcalf gave his consent to the warrantless search of his residence in Lincoln County, Tennessee, on or about September 9, 2006. Thus, the search of said residence, and the seizure of items therein, were unreasonable with the meaning of the Fourth Amendment to the United States Constitution.

Accordingly, Defendant's Motion to Suppress Evidence [Court Doc. No. 12] is **GRANTED**, and all evidence seized as a result of such unlawful search shall be **EXCLUDED** from evidence at the trial of this matter.  *See Wong Sun*, 371 U.S. at 484.

SO ORDERED this 30th day of July, 2007.

                                            */s/Harry S. Mattice, Jr.*
                                            HARRY S. MATTICE, JR.
                                            UNITED STATES DISTRICT JUDGE